UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 9:25-cv-80262

| | |
|---|---|
| CARY CANTNER, on behalf of himself and others similarly situated, | |
| Plaintiff, | **CLASS ACTION** |
| v. | |
| GAME OF SILKS, INC., DAN NISSANOFF, TROY LEVY, TROPICAL RACING, INC., RON LUNIEWSKI, and DEREK CRIBBS, | |
| Defendants. | |

**AMENDED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ................................................................................ 1

II.     JURISDICTION AND VENUE ......................................................................... 5

III.    PARTIES ............................................................................................................ 6

        A.    Plaintiff ................................................................................................... 6

        B.    Defendants ............................................................................................... 6

IV.     FACTUAL ALLEGATIONS ............................................................................ 7

        A.    Background on Blockchains and NFTs ................................................... 7

        B.    Game of Silks and Its Digital Assets ..................................................... 9

        C.    The NFTs Were Sold As Investments That Fueled the Growth of the
              Company ................................................................................................ 13

        D.    The Defendants Told Investors that they Would Profit From the NFTs ............. 16

        E.    Game of Silks Partnerships and Collaborations .................................... 23

        F.    The Market Froze In July 2024 and the True Economic Situation Was
              Revealed ................................................................................................ 27

        G.    Game of Silks NFTs Are Securities Subject to Regulation Under the
              Securities Act ........................................................................................ 30

              1.    The Securities Involved a Common Enterprise ......................... 30

              2.    The Securities Were Sold and Purchased With the Expectation of
                    Profits From the Efforts of Others ............................................. 32

              3.    The Sale and Purchase of the Securities Took Place in the United
                    States .......................................................................................... 33

V.      CLASS ACTION ALLEGATIONS ................................................................. 34

VI.     CAUSES OF ACTION ..................................................................................... 36

        COUNT I ..................................................................................................... 36

        COUNT II .................................................................................................... 38

        COUNT III ................................................................................................... 42

COUNT IV................................................................................................46

VII.   PRAYER FOR RELIEF ...............................................................................46

VIII.  JURY DEMAND ..........................................................................................47

Plaintiff (as defined herein), by and through his attorneys, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, among other things, his counsel's investigation, which includes, without limitation, review and analysis of press releases, new articles, websites, state corporate filings, other publicly available information concerning the Defendants (as defined herein) and Game of Silks NFTs ("Game of Silks NFTs" or the "Security" or "Securities").

## I.     NATURE OF THE ACTION

1.     Defendants created a company to build a computer game called Game of Silks that brought real-life horse racing to the metaverse. Participants could invest in virtual versions of real racehorses and, when the racehorses won at the race track, the owners of the virtual horses would win real money—roughly 1% of the racehorse's real earnings. Defendants promoted the game as a way for investors like the Plaintiff and the Class (defined below) to get the virtual experience of owning and managing racehorses and see a healthy return on their investment as the game succeeded.

2.     The Game of Silk software relied on cryptocurrency and web3 technologies. Specifically, investors could purchase various crypto assets that would allow them own avatars (which were like jockeys), racehorses, parcels of land, and stables in the game's metaverse. Each of these crypto assets were sold as non-fungible tokens ("NFTs") that could be purchased and sold in the online economy. For example, the Defendants released two "seasons" of racehorse NFTs (the "Horse NFTs"), and each season was a collection that represented real racehorses born in one year. Defendants also promised that the investors could combine their parcels of Land NFTs in the game's metaverse in order to build stables, where they could earn money by charging rent to stable other players' Horse NFTs. Since many of the real-life race horses would never win in real

1

races and therefore never win money in the virtual game, the Defendants promised that the investors could diversify their risks by owning shares of horses or combining their horse collections with other investors in a syndication process.

3.      Not unlike a startup company seeking venture capital, the Defendants sold these various NFTs as a way to fund the growth of the Company (defined below) and allow investors, like the Plaintiff, to benefit from the success of the Company.  For example, while owning an Avatar NFT was a prerequisite for owning a Horse NFT, the Defendants also made it clear that the funds from their sale would drive the Company's development:  "The next source of funds is coming from the Avatar drops[.] [W]e are not spending that money on ourselves[,] we're spending it on the platform[.] [T]his is the capital that will be used to build out the metaverse in the build-out of the next layer of Technology[.] [T]he funds will be used . . . predominantly for the development of the project and for operating costs."

4.      The Defendants made it clear that the investors would see increased returns and profits in a number of ways: their virtual-world racing rewards would increase as the real-world purses grew at 4% to 5% each month; as the game became more popular, the price of their NFTs would increase; they could earn passive income by "staking" or renting their assets to other players; the percentage of the payout would increase from 1% to 100% of the real-world earnings as the game became more popular; and several other ways that the investors would profit from the work of others.  The sale of these crypto assets were investment contracts, and therefore they were securities under the requirements of the Securities Act of 1933.

5.      The Defendants raised millions of dollars from these sales.  For example, the first collection of NFTs—the Avatar NFTs—sold more than 7,358 units as of June 22, 2024, at a price

of 0.2 ETH[1] each. At current exchange rates, this would be more than $4 million.  The 8,525 Season 1 Horse NFTs were sold for up to $750 each, which could have raised up to $6.3 million. The Defendants also sold Land NFTs and Season 2 NFTs for substantial amounts of money.

6.      After the Season 1 Horse NFTs were issued, at first the Defendants paid out the winnings as they said that they would, distributing more than half a million dollars to owners of thousands of horses.

7.      Based on the promises and promotions of the Defendants, the Plaintiff and other members of the Class invested millions of dollars in these NFTs.

8.      Like many other crypto projects, the Defendants relied heavily on the community of investors.  They fostered this comradery in online forums and chatrooms, such as Discord, Twitter, and YouTube.  They held dozens of Ask Me Anything ("AMA") sessions, where corporate representatives and the Defendants would present the plans for the Company, discuss the details of the NFTs, and take questions from the community.  Defendants were in near constant contact with the Plaintiff and the Class as a whole in order to promote the game and the sale of the NFTs.  The Defendants also discussed the payouts for each Season 1 Horse NFT throughout the racing lifetime of the real-life horse.

9.      The Defendants secured the endorsement of several influential partners, including the New York Racing Association ("NYRA"), the Jockey Club, and Fox Sports.  Perhaps most importantly, the Defendants announced the early investment and support of Defendant Tropical Racing, which is controlled by co-founder Defendant Troy Levy.  As the press releases made clear,

---

[1] "ETH" is the cryptocurrency Ether, which is traded on the Ethereum blockchain.  *See generally* https://ethereum.org/en/.  Unless otherwise indicated, all monetary values with a "$" represent values in United States Dollars (USD).

"Having the public thoroughbred racing company as its lead strategic investor brings legitimacy to the venture."

10.     Unfortunately, everything fell apart shortly after the Season 2 Horse NFTs failed to sell as expected.  The value of the other NFTs collapsed, the payouts from the Season 1 Horse NFTs stopped, and the project stopped development almost immediately.  Plaintiff and other members of the Class are left with nothing for the millions of dollars that they invested.

11.     Even though these crypto assets were actually securities, they were never registered with the United States Securities and Exchange Commission ("SEC"), as required by the Securities Act of 1933.  Defendants therefore violated Rule 12(a)(1) when they sold the NFTs.

12.     Additionally, Defendants omitted key information when they promoted and sold these NFTs.  Shortly after the market collapse, several leading members of the Game of Silks community held a video conference with Defendant Troy Levy (co-founder and president of the Company, as well as the owner of Defendant Tropical Racing) and a director of the Company to discuss the potential future of the project.  During that call, Troy Levy and the director disclosed several pieces of material information for the first time.

13.     *First*, even though the Defendants promised that they would be fully transparent about how the funds raised from the sale of NFTs would be used, the Company never provided critical financial information about its business prior to this call.  Importantly, it was disclosed on the call that the Company needed to receive revenues of more than $20 million per year in order to stay in business.  It had not come anywhere close.  The Defendants had not informed the investors that the payment of winnings for Season 1 Horse NFTs would stop if it did not sell enough Season 2 NFTs.

14.     **Second**, even though the Defendants proudly announced the investment by the racing company controlled by Troy Levy—Tropical Racing—as a key indicator of support for the Company, Troy Levy disclosed on the call that Tropical Racing had actually exited its investment in Game of Silks months earlier.

15.     **Third**, Troy Levy also disclosed that the Board had determined that no amount of cash infusion would have enabled the Company to continue at that point.  That reveals a fundamental flaw in the business model that was never disclosed to the Plaintiff and the members of the Class.

16.     As a result of these material omissions and half-truths in the sale and promotion of the securities, Defendants violated Rule 12(a)(2).

17.     The individual Defendants are liable to Plaintiff and the Class both in their individual capacity and as control persons.

## II.     **JURISDICTION AND VENUE**

18.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 77v, which vests jurisdiction for claims under the Securities Act in U.S. District Courts.

19.     Venue is proper in this District pursuant to 15 U.S.C. § 77v because Defendants are located in, reside in, or are inhabitants of this District, the Defendants transact business in this District, and/or many of the acts charged herein occurred in substantial part in this District.

20.     In connection with the acts, transactions, and conduct alleged herein, Defendants:

a)     Made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell the unregistered securities at issue in this litigation through the use or medium of any prospectus or otherwise.

b)      Carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, the unregistered securities at issue in this litigation for the purpose of sale or for delivery after sale.

c)      Made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise the unregistered securities at issue in this litigation.

## III.    PARTIES

### A.      Plaintiff

21.      Plaintiff Cary Cantner ("Cantner"), as set forth in the accompanying certification, incorporated by reference herein, purchased the Game of Silks NFTs and was damaged thereby.

### B.      Defendants

22.      Defendant Game of Silks, Inc. ("Game of Silks" or the "Company") is a corporation organized and existing under the laws of Delaware.  Game of Silks' principal place of business is in Boca Raton, Florida.  The sale and marketing of the NFTs took place throughout the United States, utilizing multiple platforms accessible nationwide, thereby supporting jurisdiction and venue in this court.

23.      Defendant Dan Nissanoff ("Nissanoff") was the CEO and Founder of Game of Silks.  He is a resident of Boca Raton, Florida.

24.      Defendant Troy Levy ("Levy") was the Vice President and Founder of Game of Silks.  He is a resident of Boca Raton, Florida.

25.      Defendant Tropical Racing, Inc. ("Tropical Racing") is a Florida corporation with a principal place of business in Versailles, Kentucky.  According to the Tropical Racing 's offering circular dated May 4, 2021, Tropical Racing "operates its thoroughbred horse racing business out of the State of Florida."

6

26.     Defendant Ron Luniewski ("Luniewski") was the Chief Operating Officer of Game of Silks.  He is a resident of Los Angeles, California.

27.     Defendant Derek Cribbs ("Cribbs") was the Chief Financial Officer of Game of Silks.  He is a resident of New York, New York.

28.     Defendants listed in paragraphs 22 through 27 are referred to herein collectively as the "Defendants."

29.     Defendants Dan Nissanoff, Troy Levy, Ron Luniewski, and Derek Cribbs are referred to herein as the "Control Person Defendants" or "Individual Defendants."

## IV.     FACTUAL ALLEGATIONS

### A.     Background on Blockchains and NFTs

30.     A blockchain is a decentralized digital ledger generally associated with the transfer and recording of digital currencies (cryptocurrencies) and digital assets.  It operates across a distributed network, maintaining a shared, permanent record of all transactions.

31.     Traditional ledgers, like those managed by banks, are centrally controlled and validated by a single trusted authority.  In contrast, blockchains operate through a decentralized network, where no single entity controls the ledger.  This structure allows for more transparent ownership tracking and less reliance on central authority.

32.     Non-Fungible Tokens (NFTs) are a type of blockchain technology that represents unique digital data or assets.  NFTs differ from other digital assets, like cryptocurrencies, in that they are not interchangeable with one another due to their distinct, individual characteristics.  NFTs use blockchain as a way to assign and verify ownership of a unique piece of data.

33.     One of the primary uses for NFTs is for the sale of digital art, collectibles, or access to private clubs.  In these cases, NFTs are marketed to consumers as unique representations of ownership over digital creations.  The value of these NFTs is generally driven by their rarity,

branding, and the exclusive experiences or communities they unlock for their holders.  Famous examples of these types of NFTs include the Bored Ape Yacht Club collection.

34.     Another significant use for NFTs involves raising funds for the development of future projects, such as movies, video games, or tech startups.  These NFTs are often marketed as investment-like instruments, offering buyers potential future returns in the form of profit-sharing, dividends, or exclusive access to the eventual products or services developed by the funded project.  For example, buyers of these NFTs may receive promises of a share in future revenue generated by the project, or they may be granted early access to products as they are developed.  The critical feature of this segment is that the value of the NFTs is directly tied to the future success of the underlying venture, making these NFTs more akin to speculative investments than collectibles.  From a historical perspective, issuing a specific NFT in a collection is similar to issuing a unique certificate for each share of common stock that a company issues.

35.     In this capital formation context, the NFT functions similarly to traditional fundraising models, where participants contribute capital in exchange for a potential future stake in the project's success.  The value of these NFTs is contingent on various factors, such as the project's team, market fit, execution, and consumer demand.  Investors assess the likelihood of the project reaching its goals in the same way venture capitalists evaluate startups.  This type of NFT offering closely mirrors traditional securities, where the financial return is directly linked to the project's success, making the buyer's expectations analogous to those of equity investors.

36.     Some NFTs are digital tokens tied directly to real-world assets, events, or data, and their value is driven by real-world outcomes.  These derivative NFTs could represent real estate, commodities, or professional athletes, and the value of the NFT fluctuates based on the performance or status of the underlying asset in the real world.

37.     In sum, the diversity within the NFT market includes both speculative capital formation NFTs, which closely resemble traditional securities, and derivative NFTs, which are related to real-world asset performance.

38.     When an investor wants to purchase an NFT, they will create the NFT through the "minting" process, which is controlled by the issuer of the NFT collection.

39.     NFT issuers also sometimes reward the holders of their NFTs with "airdrops," where the holders on a certain date will receive something valuable, which might be an additional similar NFT, an NFT from another collection, or some other crypto asset such as a token.  These airdrops can be similar to receiving a dividend or a coupon payment on a security or note.

**B.     Game of Silks and Its Digital Assets**

40.     The Game of Silks game was designed to replicate the real-world horse racing industry in a virtual setting, allowing users to assume roles similar to those in the actual sport. Through the use of various NFTs, players could immerse themselves in the roles of horse owners, stable managers, landowners, and syndicate members.  Purchasers of the NFTs would win money when their corresponding real-life horses won races.

41.     The first NFT that the Defendants offered was the Silks Avatar NFTs, which looked like digital racing jockeys.  Some Silks Avatar NFTs look like this:[2]

---

[2] *See* https://opensea.io/assets/ethereum/0xa03e357a09e761e8d486a1419c74bf42e8d1b064/1397; https://opensea.io/assets/ethereum/0xa03e357a09e761e8d486a1419c74bf42e8d1b064/4838.  The NFTs are often available for sale on the NFT trading platform OpenSea.com.

 

42.     Each Silks Avatar NFT has a unique combination of characteristics or traits, such as the color of the background, the style of the helmet or jacket, the eyewear, or the pattern on the uniform.  The Silks Avatars NFTs were also differentiated by tiers, with the first 5,000 avatars receiving special benefits such as airdrops of other NFTs.

43.     The Silks Avatar NFTs represented the user's identity in the metaverse, and they were initially required for participation in many of the game's key functions.  The colors and designs on the Silks Avatars NFTs were used as an identity on other assets that a user owned.  For example, the pattern on the Avatar's jersey might appear on the horses and stables of each user.

44.     On or about April 27, 2022, Defendants commenced the sale of the Silks Avatars NFTs, with 7,358 avatars minted as of June 22, 2024, at a price of 0.2 ETH per avatar (approximately $736 at current exchange rates).

45.     The Season 1 collection of Silks Horse NFTs represented horses that were born on or after 2021.  Some examples of the Silks Horse NFTs include:[3]

---

[3] *See* https://opensea.io/collection/silks-s1-racehorses.

10

 

46.     Similar to the Silks Avatar NFTs, the Silks Horse NFTs included different traits that could be organized, such as their sex, their father (the broodmare sire), their mother (the broodmare), or their color.

47.     Game of Silks launched the sale of its Season 1 Horses on October 26, 2022, with 8,525 horses minted at an initial price of $500, which was later raised to $750.  Each Silks Horse NFT was a derivative asset tied to a real-world thoroughbred racehorse, and owners were promised increasing rewards based on the horse's performance over time.

48.     For example, in an April 18, 2022 AMA, the Company's representatives explained how the upcoming payouts would be based on real-world racing, where the in-game payout would be approximately 1% of the real-world purse.  They then explained that the Defendants expected the value of the in-game payouts to increase to the point that they equaled the real-world payouts as the game became more popular and more people purchased the crypto assets:

> Now ultimately we believe that eventually we can catch up to the real world to wear our tokens on become equal in value to the real world price vs right so we believe that there will come a point where we're taking in the same amount of money that the real world is giving out and prize purses each year[.] [S]o if the real world is giving out a billion dollars a year [in prize] purses if we can take in a billion dollars

a year in inflows from the sale of our assets then the prize purses that we can distribute become equal to the real world [prize purses.]

49.     On March 8, 2024, Game of Silks launched the sale of its Season 2 Silks Horse NFTs at an initial price of $1,250, which was later reduced to $875.  Like the Season 1 Horses, these NFTs were tied to real-world thoroughbreds, and purchasers were promised similar rewards, including increasing payouts based on race performance and lifetime earnings from horse winnings and breeding.  The Season 2 horses similarly had different traits that were based on real-world characteristics, and looked like this:[4]



50.     Land ownership was another key element of the game, with Silks Land NFTs representing virtual plots where horses could be stabled.  Each investor's horses had to be stabled somewhere, and owning land and building a stable would allow players to avoid renting space in someone else's stable.  Players who owned ten contiguous plots could establish public stables, where other players could stable their horses for a fee.

---

[4] *See* https://opensea.io/collection/silks-racehorses.

51.     The Silks Land NFTs also had traits such as their region in the metaverse and whether or not they were privately held, and they each had a location based on a coordinate in a grid in the metaverse.  They looked like this:[5]



### C.     The NFTs Were Sold As Investments That Fueled the Growth of the Company

52.     The Defendants developed a community of investors who were interested in owning virtual racing horses in order to promote the sale of the Game of Silks NFTs, bring in funds to develop the Company, and develop a secondary market for the NFTs.

53.     The Defendants developed this community and increased engagement through online forums such as Discord, posts on Twitter / X, AMA sessions, and videos posted on YouTube.

54.     Notably, the Company designed the NFTs such that the Company would receive a "royalty" payment from every sale or purchase of the NFTs in the secondary market, ranging from 5% to 8% of the transaction price.  As a result, the Company was supposed to be a party to each

---

[5] *See* https://opensea.io/collection/silks-land.

subsequent sale of the NFTs, and the Company would benefit from speculation and reselling of the NFTs.  As the community around Game of Silks grew, so did the project's economy.

55.     The Defendants informed investors that the proceeds from these NFT sales would be used to develop the full Game of Silks metaverse, including features such as virtual stables, public barns, and in-game marketplaces.  The pooling of investor assets was critical to developing the metaverse and the broader infrastructure, which was necessary for the platform to function and succeed.  This created a shared outcome between the investors and the investment pool, as the success of these initiatives would directly impact the value of the NFTs owned by investors.

56.     Defendants made this explicitly clear in materials including an AMA on April 24, 2022 on Twitter:

> [T]he next source of funds is coming from the Avatar drops[.] [W]e are not spending that money on ourselves[,] we're spending it on the platform[.] [T]his is the capital that will be used to build out the metaverse in the build-out of the next layer of Technology[.] [T]he funds will be used for the predominantly for the development of the project and for operating costs[.] [W]e will need an off-ramp from ETH to Fiat to operate in the early days because the marketplace isn't quite there yet[.] [W]e have real expenses[,] people need to get paid salaries[,] vendors need to get paid in dollars than not all taking [Ethereum] so we are going to have to offer a capital at various stages and convert it into Fiat to be able to pay our vendors[.] [T]hat's very important for you to understand because you will eventually have complete transparency into our wallets because it is a [—] it will be a [DAO][6] wallet that's collectively-owned by the community[.] [T]hat's what's important for you to understand[,] that we are going to use this Capital to develop the next stage of the business[.]

57.     Similarly, the Defendants stressed in this AMA session that investors in the Game of Silks NFTs were stakeholders in the project: "[W]hen you buy an Avatar you're buying into a platform[,] you're becoming a founding member of this platform and a stakeholder in the project and can benefit in many ways from that."  They continued to predict that the first round of

---

[6] A Decentralized Autonomous Organization ("DAO") is an organizational structure with no central governance body that is a popular way for web3 communities to manage and direct a blockchain project.  *See generally* https://www.investopedia.com/tech/what-dao/.

Avatars—known as "Genesis" Avatars—would become more valuable in the future as they showed that the owner was "an OG, you're an original gangster, and you are a stakeholder from the beginning," and that they "will receive significant unique benefits that will be available to nobody else."  The Defendants eventually offered these first few thousand Silks Avatar NFT holders financial benefits, such as discounts on purchasing Horse NFTs.

58.     The Defendants continued in the same discussion to explain that all of the crypto assets that they would issue would be visible on the blockchain because of the DAO[7] structure: "[A]ll future inflows and outflows will take place for the DAO and you will all have complete visibility into the balance of the DAO has[.]  [T]hat is essentially going to dictate the value of our assets[,] both our horses[,] our land[,] our Farms or structures[,] and most importantly our tokens." At the time, the Defendants claimed the they would issue tokens referred to as $STT tokens to serve as a currency in the ecosystem.

59.     Defendants could not have been clearer on the April 24, 2022 AMA that the investors in the community were funding the growth and development on the economy, which they expected to grow with more participants:

> I want everyone to understand that this is going to be [a DAO.]  [*T]he proceeds from everything that comes into the [DAO will] go to the development of the platform into the operations of the platform* which means that the costs associated with any drop that we do is [—] *you're not paying for something[,] you're investing in the platform because every dollar that goes into the purchase of [this] asset goes into the community wallet that act [as] the Federal Reserve that bolster the economy and [backs our] tokens and our assets*[.]  [V]ery important that you understand this economy and how it operates because it is your economy and it is your money and it is collectively your wallet as much as it's [ours.]  [E]verything will go into the treasury wallet beginning with the horse drop and every drop going [forward] after that as I indicated earlier the initial proceeds will go into a corporate wallet that will be used to fund the operations of the business until the wallet is created which will come as soon as the [entity is] created[.]  [T]he future prices of

---

[7] A DAO refers to a decentralized autonomous organization, which is a community-owned organization commonly used in the web3 world.  DAO's frequently decide how to operate based on voting mechanisms or other methods of governance.

our [mints] will dictate how fast we reach parity with the in real-world prize purses
and so ultimately the higher our assets are worth the faster that will happen[.]

60.     In the April 24, 2022 AMA, the Defendants and their representatives described how

they would work to increase the demand for the Game of Silks crypto assets:

[W]e will continue to invest in promoting awareness to ensure that there is
substantial demand for our assets and to ensure that people that want to get in can
get in[.] [T]hey will spend more money to get in then if they came in early but we
want to ensure that we continue to build the community and to flush out anybody
that was really in here just to some kind of ride the value of the Avatar and flip[.]
[S]o we're going to replace those people with people that really want to be involved
in the metaverse and in the game and that's only going to come from bringing a
new people into [] the community[.] [S]o we are going to invest heavily in
continuing to drive awareness [and to] continue to bring people in the community[.]

**D.     The Defendants Told Investors that they Would Profit From the NFTs**

61.     The Defendants told the community that their investment in the NFTs would grow

in value as the project grew.  For example, as explained in the whitepaper issued in Q1 2022,

"Land speculators may purchase and hold land anticipating that the value will increase with both

the growth of the economy and new land uses that may be introduced in the future."  Q1 2022

Whitepaper, p. 14.  In other words, the return of their investment would increase as the game

economy grew.  Similarly, the whitepaper explained that landowners would profit from the success

of others: "Horse farm developers will be incentivized to acquire land and develop farms so that

they can share in the winnings of horses staked in their farm.  A ten-acre farm will earn a minimum

of 10% of all racing purses won from each staked horse."  *Id*.  Troy Levy repeated this sentiment

in an AMA on April 26, 2022, when he said that "the Game of Silks and what we're doing is that

[we are,] you know[,] having you put your horses in a stable and now you're reaping the rewards

or the profitability or the revenue streams of all the horses inside [that stable,] so now it's giving

you that feeling of owning a tremendous amount of horses."

16

62.     The game also encouraged collaboration through syndicates, where players could pool their resources to buy shares in multiple horses.  Syndicates allowed participants to diversify their investments, reducing the risk associated with owning a single horse.  By joining forces with other players, participants could share in the winnings of all the horses within the syndicate.

63.     This feature replicated real-world racing partnerships, where multiple owners share the costs and rewards of horse ownership.  Some syndicates were more formal, issuing digital asset "governance tokens" to manage horses, while others operated more informally, allowing members to trade fractional ownership among themselves.

64.     Not only would investors earn money on their Silks Horse NFTs when their real-life horse doppelgangers won prize money, the amount that they earned was supposed to increase from 1% to something much more as the project and the economy grew over several years.  In the April 18, 2022 AMA, defendants detailed the time frame when they expected the payments to approach real-world earning levels:

> [W]e currently are projecting that to take between six and seven years and that that we the velocity of that slope and how fast we get there can either be slower or shallower or steeper and that's going to largely depend on the community[.] [T]his community is coming in to this project at a relatively[—]with a relatively small investment amount and we expect that the value of these assets over time as more and more people want to be a part of this project are going to grow and the early adopters in the space will be the likely beneficiaries of the appreciation of these assets.

65.     The Defendants and their representatives made it clear that they, including Defendant Levy personally and his company Tropical Racing, would be working to develop this economy and increase the value of the investments:

> And we know we're having a newsletter going to be doing a bunch of things that will get a tremendous amount of awareness pointing to us that will add a lot of value and create a lot of demand for what we're doing. [S]imilarly [T]ropical [R]acing he's going to intend [—] it intends to develop a syndication farm and they're going to develop a use case and share how it's done in an in an AMA in the future[.] [B]ut basically they love the idea of buying land and building out stables and pre-reveal

with the horses [will] be able to [syndicate] and allow people access that may not be able to afford an entire horse early on and so they're going to use the platform to build a case study we'll talk a lot more about it[.] I'm super excited and Troy is going to lead an [AMA] on that in the near future[.] [W]e think there's a huge opportunity for people that want to get involved [on] a larger scale developing Farms that indicate their horses and we kind of want to develop the use case for that and actually demonstrated in [T]ropical [has] volunteer to do that in the end shown interest[.]

April 24, 2022 Twitter AMA

66.     A few days later, on April 26, 2022, Troy Levy held that AMA, and reiterated that

he and Tropical Racing would be active in the game in order for people to understand the process:

[W]hat I'm planning on doing with tropical is basically I thought one of the best ways to participate and give tutorials and let's say lessons in regards to the industry is to truly participate in the Game of Silks in the economy so my plan is to go out in the open and buy horses and by land and by a stable and Syndicate the horses and truly put a manager you know what like a Syndicate manager like we have in the real world in the metaverse and really kind of give a life lesson in regards to how to how to how to make this work

April 26, 2022 AMA

67.     Troy Levy and Ron Luniewski also made statements in early 2023 in the AMAs

and elsewhere that the fractionalized ownership would provide for a more diverse and appealing

investment opportunity: "Game of Silks will enable syndication for fractionalized ownership,

allowing players to diversify their holdings and minimize risk."  Defendants promoted these

features even though the syndication model was never implemented, and unlikely to ever be

implemented.  They promoted it regardless, seeking to maximize NFT sales by making the

platform appear more dynamic and risk-managed than it was.

68.     Furthermore, during an April 18, 2022 AMA, Dan Nissanoff and Troy Levy had a

conversation about the upcoming syndication feature, and the Company representative explained

that the syndication model would allow one party to be a "general partner" in the syndicate and

the other investors could be passive partners who profited from the general partners' decisions:

[T]he person with a governance token is the person that is making the decisions around the horse just like the general partner in a syndication when you become a participant in a syndicated force in the real world there is one General partner that's responsible for managing the horse and making all the decisions they decide which race has to enter they decide which trainer to use, [which jockey] to use[,] whatever [] decisions need to be made.

69.     The AMAs and the whitepaper also included statements from Dan Nissanoff and Troy Levy that promoted the ability to receive passive income from stables and horses through a "staking" program, where other users paid to use the assets: "Players will earn income from stabling horses in their stables and through staking horses on their land, creating an ongoing revenue stream for land and horse owners."   The Defendants promoted stabling and staking functionalities, knowing that they were not operational or fully developed.   By promoting these features without a realistic expectation of delivery, the Defendants misled investors into purchasing NFTs under false pretenses, intending to increase sales despite the platform's inability to deliver these utilities.

70.     While the Company executives did warn that the investments involved risks, in the April 24, 2022 AMA they literally said that the warnings were boilerplate warnings and they were the same as any other NFT project:

[S]o there is risk[, and] we believe that will be able to deliver everything we promise[,] but again it's important for you to understand that nothing is guaranteed[.] [E]verything I'm telling you is standard and applies to everyone[.] [T]he most successful projects in the [NFT] world [—] go on to OpenSea and look at whether its Moon Birds or Crypto Punks or Clonex or Azuki or any other of these massive blue-chip projects [—] they would all disclose that they have the same risk so ***what I'm sharing with you is really boilerplate and it's applicable to everything in this industry***[.]

71.     The Defendants also promised that the game would have longevity.   Even though real-life race horses might only race for a few years, the Defendants promised that they would provide opportunities to remain engaged and still profit from the horses.   During the April 26, 2022 AMA, the Defendants' representative explained that if a race horse died or retired, "we have a lot

of things in store for that[.]   [W]e have so many different ideas but also things that are in

development in regards to the airdrops in regards to functionality and gameplay that will provide

people with a lot of value to this project[.]"

72.    When asked on the April 24, 2022 AMA on Twitter what would happen if the

collection of NFTs did not sell out completely, the Defendants' representative stressed the number

of people who were signed up on the "whitelist" to receive early access exceeded the number of

available NFTs.  He then continued to say that

> we will make sure that that if you are out there and we have [the NFTs] available
> we'll keep it out there will continue to promote platform[,] [A]gain this is a long-
> term play and I expect that very quickly people are going to find us and want to be
> a part of this[.] [S]o our intention is strictly to support the community to support
> the value of these avatars and to ensure we're doing it in a way that that protects
> the value of the Avatars for the company[,] for the platform[,] [and] for the
> community[.] [S]o you can be rest assured we have completely aligned interest to
> all of our constituents and members of this community[.]

73.    In an April 26, 2022 AMA, Troy Levy also spoke to investors about the importance

of investing in Horse NFTs early because they would earn greater passive income when the real-

life mares started breeding successful horses in later years:

> [O]ne of the main points I wanted to bring up was how important it is to get
> everyone situated today early on because . . . over x amount of years the parallel in
> the mirroring of the token economics in the economics of the horse-racing industry
> it's going to sooner or later be in parallel[.] [A]nd what that means and simple is
> that we believe you do 5-6 years down the road that if the real life horse makes
> 50,000 that the investors and the horses under on the game itself was going to
> make$50[,000.] [A]nd it's going to take a few years to get there but the most
> important part is owning the resources today[,] especially let's just say some of the
> female horses that [—] and of course than the male horses to become stallions [—
> ] but what percentage of the female horses is the situate yourself in having a few
> because when they start having babies which will be 3, 4, 5, 6 years[,] you know[,]
> down the road where is the where every single year that mare is having a baby that's
> going to be the time when this game is full and its neighboring and paralleling the
> real life world[.] [A]nd that's you know my mind is that passive income . . .  [M]y
> mares having a baby every single year or by 2 or 3 and now they're selling for x
> amount of dollars and I'm receiving x amount of dollars every single year when
> that baby sold in the Game of Silks[.] [S]o I really think it's that[,] and I've always
> lived this[,] that the first one's [in are] the last ones to leave[.]

74.     In a January 24, 2024 Twitter Space,[8] Troy Levy continued this theme, noting the increase in real-world purses.  He stressed that two-year old horses had only earned 11% of their lifetime earnings, but that horses in their third year would make 30% of their lifetime earnings.  As a result, Troy encouraged investors to anticipate greater payouts from the NFTs in the near future.  He also stressed that, in the real world, the purses historically increased 4-5% each month; the Kentucky Derby payout in particular recently increased from $3 million to $5 million.  As a result, the reward money paid out in the Game of Silks should also expect to increase at the same rate every single year because they track real-world payouts.

75.     As the Season 1 Horse NFTs raced and the Defendants prepared to offer the Season 2 Horse NFTs, the Defendants stressed the successful payouts to the participants so far.  In the same January 24, 2024 Twitter Space, the Defendants detailed the statistics of the payouts to date, bragging that they had already distributed more than half a million dollars to the owners of more than 3,000 Horse NFTs.  One NFT had even received a payout of more than $10,000.  Defendants made it clear that they expected the winnings to continue.

76.     In a recap of the Season 2 Horse NFT AMA published on February 2, 2024, the Company discussed a new way for the NFT holders to earn profits from the work of others:  the Breeders Fee.  (Defendants Levy and Luniewski both presented at this Twitter Space AMA, which is available at https://t.co/vGTxpR6kKd.)  As detailed in the summary, "breeding" horses would allow NFT holders to receive a portion of future purchases and sales by third parties of their "offspring":

- Starting with the first Silks horse in the breeding shed, breeders will receive 1.5% of the purchase price of offspring from Sires and 3.5% from Broodmares owned by Silks players.

---

[8] *See* https://twitter.com/i/spaces/1zqKVqkvAEZxB.

- Fees will be paid 30 days from the purchase of offspring. Payments will be made to the wallet holder of the Sire and Broodmare on the day the fee is paid.

77.     In the Twitter Space itself, Defendant Levy stressed that Defendant Luniewski was critical for the success of the Company.  In turn, around minute 8, Luniewski said that Levy "put his money where his mouth was."

78.     In a May 10, 2024, AMA,[9] Defendants Levy, Luniewski, and others discussed new changes to the platform that were designed to "increase engagement" and drive traffic to the site. For example, they discussed a new feature that they were calling the "Weekly Snipe," where horses that were running races over the weekend would be listed and available for sale through minting on Thursday afternoon.  This would be "huge for immediate interaction and [] immediate payouts." They also discussed an affiliate program, which would reward community members financially as they spread the word and increased engagement.  As Defendant Luniewski said around minute 21, they saw "a lot of upside with the affiliate program."

79.     Defendant Luniewski also stressed that they were following the roadmap, including a lot of improvements.  He told the community that they "couldn't be more happy" with the Twitter engagement and other social media, which were key indicators for growth, and that there would be "a lot of upside."

80.     Around 30 minutes into the AMA, Defendant Luniewski fielded an unrecorded question about what would happen if the Game of Silks ran out of money.  He told the audience that they "do have a plan in place to escrow that money, . . . but you know we're in startup mode and we're certainly fiscally responsible people. . . . You know make a commitment, a horse could live for 20 years, but you know that's the plan for the game."  In his closing remarks, he stressed

---

[9] *See* https://www.youtube.com/watch?v=F-zUybE8ano.

that "where we're at now, everything's organic, we're going to continue to grow it and learn from it."

        **E.**     **Game of Silks Partnerships and Collaborations**

    81.    The Defendants also promoted the authenticity and legitimacy of the project by developing real world partnerships with leaders from the horse racing industry.

    82.    One of the earliest and most significant partnerships was with Tropical Racing Inc., which invested $2 million in the Company in April 2022. Tropical Racing, led by CEO Troy Levy, who was also a co-founder of Game of Silks, is a prominent thoroughbred horse breeding and racing company with a 200-acre farm focused on breeding, racing, and syndicating thoroughbreds.

    83.    Tropical Racing's involvement brought significant industry expertise and financial support to the project. This partnership was intended to introduce users to real-world horse ownership and allow them to engage in the digital ownership of thoroughbred horses.

    84.    This partnership was designed to integrate Tropical Racing's deep industry expertise with Game of Silks' blockchain-based metaverse platform, aiming to bridge the gap between the real-world horse racing industry and a virtual play-to-earn (P2E) gaming economy. Tropical Racing provided not only strategic guidance but also financial support, positioning the Game of Silks platform to introduce thoroughbred horse ownership to a new generation of sporting enthusiasts through the use of Web3 technology. As the press release announcing the funding noted, "Having the public thoroughbred racing company as its lead strategic investor brings legitimacy to the venture."[10]

---

[10] *See* https://www.newsbtc.com/news/company/silks-secures-2-million-funding-to-develop-the-first-ever-thoroughbred-horse-racing-metaverse/; https://cointelegraph.com/press-releases/silks-secures-2m-for-thoroughbred-horse-racing-industry-in-the-metaverse.

85.     Tropical Racing continued to promote Game of Silks through its mailing lists for years and into 2024, sometimes blurring the lines between the companies.  For example, on December 7, 2022, Tropical Racing distributed a press release announcing the investment by NYRA Bets Holding, LLC in Game of Silks, and provided a link to Tropical Racing's website for more information.  The press release also made it clear that the digital assets in the Game of Silks would represent horses throughout their "productive racing and breeding careers spanning their 20 year lives," and that purchasing the racing-related digital assets would "support the Silks ecosystem."

86.     An April 22, 2022 email from Tropical Racing promoted the then-upcoming sale of Avatar NFTs, positioning Tropical Racing as a partner in the process: "Tropical Racing and Game of Silks are extremely excited to join the ranks of companies Poker Stars and Fan Duel that have changed the game."

87.     When Tropical Racing rebranded its website and logo in early 2024, it included Game of Silks as one of its brands.

88.     On September 15, 2023, a Tropical Racing newsletter promoted Troy Levy's role both as CEO of Tropical Racing and as co-founder of Game of Silks, and described Game of Silks players cashing in on their investment when a real-life horse wins a race: "Keeneland, Aqueduct, and Santa Anita [racetracks] will all be hosting big event days with plenty of two-year-old stakes for those horses preparing for the big Championship and ***plenty of opportunity for Silks players to cash in on their investment***."

89.     Troy Levy also specifically explained in a January 24, 2024 Twitter Space that the Game of Silks project was gaining legitimacy in the real-world of horse racing, as they were increasingly become a part of the horse racing world as a real company and player, not just "an

outsider looking in."  He later explained that "We are a true company, that has the ability to overcome any adversity, and the ability to move forward, be stronger, and be better."

90.     Dan Nissanoff claimed that "our values as a company starts with trust and it starts with transparency," and that they had "shared what we we're doing for our insiders" at an AMA on April 24, 2022 on Twitter.

91.     The New York Racing Association ("NYRA") also partnered with Game of Silks in December 2022, marking another crucial relationship.  NYRA, which operates famous racetracks such as Belmont Park, Saratoga Race Course, and Aqueduct Racetrack, provided Game of Silks with a prestigious connection to real-world racing venues.  Under this partnership, Game of Silks was designated NYRA's Official Blockchain Game and Metaverse Partner, which allowed the virtual representation of these racetracks in the game.

92.     The partnership also included NYRA promoting Game of Silks on its national television broadcasts, including America's Day at the Races and Saratoga Live, which air on FOX Sports.  This collaboration was intended to drive new fan engagement in horse racing through Game of Silks' blockchain platform, making horse ownership more accessible and integrating the experience of owning and racing thoroughbreds in both the physical and digital worlds.[11]

93.     In December 2022, Game of Silks expanded its relationship with NYRA through a strategic partnership with NYRA Bets, the official online wagering platform of the NYRA.  As part of this partnership, NYRA Bets acquired a minority equity position in Game of Silks, further solidifying the Company's commitment to integrating blockchain technology with real-world thoroughbred racing.

---

[11] *See* https://www.nyra.com/aqueduct/news/nyra-bets-holding,-llc-and-game-of-silks-announce-landmark-partnership; https://www.thoroughbreddailynews.com/nyra-bets-holding-announces-partnership-with-game-of-silks/.

94.     The objective of this partnership was to leverage NYRA Bets' existing customer base and digital infrastructure to bring horse racing enthusiasts into the Game of Silks metaverse, offering them a unique opportunity to participate in virtual racing, betting, and digital asset ownership.  The collaboration with NYRA Bets was seen as a key move to modernize fan engagement by introducing them to Web3 gaming within a sport steeped in tradition.

95.     In addition to their strategic partnerships, NYRA and Tropical Racing supported Game of Silks by licensing the use of their names to virtual properties within the Game of Silks metaverse.

96.     Tropical Racing was given a 100-acre virtual farm within the Game of Silks metaverse.  This allocation was intended to replicate the real-world activities of Tropical Racing and establish a significant presence within the virtual space.  The presence of Tropical Racing's land in the metaverse was designed to draw attention and increase the value of surrounding land plots, as players viewed proximity to such a major racing entity as advantageous

97.     Similarly, the NYRA also had a 100-acre farm allocated to it within the Game of Silks metaverse.  NYRA's virtual land was situated strategically in the metaverse, making the surrounding plots more desirable for players who anticipated increased virtual foot traffic and potential collaboration with such a high-profile partner.

98.     Game of Silks also formed a strategic partnership with The Jockey Club in October 2023.  The Jockey Club is a foundational organization in the horse racing world, responsible for maintaining the registry of thoroughbred horses in the U.S.  Through this partnership, Game of Silks gained access to crucial real-world racing data, allowing the platform to mirror the actual performance of thoroughbred horses in its virtual environment.

99.    This integration of real-world data was essential for the success of the game's derivative NFTs, which tracked the performance of real-world horses, enabling players to earn rewards based on their race results.  This data-driven connection was a key selling point for the platform, creating a more immersive and realistic experience for users.[12]

100.    In October 2023, Game of Silks announced a partnership with FOX Sports' America's Best Racing, a media initiative dedicated to increasing the visibility and popularity of thoroughbred horse racing.  America's Best Racing, which produces content and broadcast coverage of major racing events, partnered with Game of Silks to promote the platform's approach to virtual horse racing.

101.    This partnership involved using FOX Sports' wide-reaching media platform to bring the Game of Silks experience to a broader audience, particularly by showcasing the metaverse's connection to real-world racing events.  The collaboration aimed to introduce a younger, tech-savvy audience to the sport by combining the excitement of traditional horse racing with the interactive elements of a blockchain-based metaverse.

102.    As part of the broader partnership with NYRA, Game of Silks incorporated the digital versions of three of the most iconic racetracks in the United States—Saratoga Race Course, Belmont Park, and Aqueduct Racetrack—into its metaverse.

**F.    The Market Froze In July 2024 and the True Economic Situation Was Revealed**

103.    While there was high demand for the Season 1 Silks Horses NFTs and they sold quickly, the situation had changed by the time the Season 2 Silks Horses NFTs were released.

104.    From the outset, Game of Silks was marketed as a DAO, with players promised voting rights and governance over key decisions.  However, the project soon shifted away from

---

[12] *See* https://www.businesswire.com/news/home/20231011150909/en/.

this decentralized model.  The leadership team centralized decision-making and kept critical financial information hidden from the community.

105.    Questions about the budget or the project's financial health were often met with hostility or evasion.  Users who pressed for transparency were banned from the community, further damaging trust between the leadership and the players.  This lack of accountability was one of the early signs that the project was not operating as intended.

106.    Financial mismanagement became more apparent as the project progressed. Despite raising an estimated $15 million through a combination of fundraising, NFT sales, and other investments, the leadership team struggled to maintain the financial sustainability of the platform.

107.    By early July 2024, the Defendants failed to sell the Season 2 Silks Horses NFTs. When the second season launched, the price for new horses was set at nearly three times the original cost.  The rewards structure, however, remained the same or in some cases, was even reduced.  This significant price increase, coupled with diminishing rewards, discouraged new players from buying into the game, causing a drastic drop in revenue.  As participation dwindled, the financial strain on the project grew, revealing the flawed economic model that was dependent on continued high sales to sustain operations.

108.    The lack of interest in Season 2 Silks Horses NFTs caused their price on the secondary market to plummet. Defendants stopped making payments on the winnings of the Season 1 Silks Horses NFTs by July 2024 even though the horses continued to run races and win purses in the real world.

109.    Many Land NFT features and benefits never materialized, leaving landowners with assets that had little to no utility.  The leadership team repeatedly promised the development of a

marketplace and other land-based utilities, but these promises were delayed or quietly abandoned. As a result, players who had invested heavily in land near key landmarks like the Tropical Racing Farm or the NYRA Farm saw their investments lose significant value.

110.    Throughout the project, the leadership team continued to earn substantial amounts while failing to deliver on the key economic promises of the game.  This raised concerns among users and investors that the project was being poorly managed, with the financial benefits accruing mainly to those in charge while players and investors were left with diminishing returns.

111.    As part of an effort to determine whether there was any viable path forward for the project or if the community was interested in successor projects, prominent members of the Game of Silks community held a meeting with Defendant Troy Levy and a member of the Game of Silks Board of Directors in late July 2024.

112.    On this call, the representatives of the Company disclosed several important pieces of information that were not previously known or confirmed.  ***First***, the director disclosed that in order for the Company to continue, it needed to bring in more than $20 million per year in revenue through continued NFT sales and other investments, but that the Company had only received approximately $7 million in revenue.  The community of investors had never been told the magnitude of the cash flow shortage.  In fact, despite claims that the Company would operate transparently to allow investors to see the flow of funds on blockchain, the defendants never released meaningful financial information.  The Plaintiff and the Class had also never been told that the promised payments on the Season 1 Horse NFTs depended on the continued sales of later seasons of Horse NFTs.

113.    ***Second***, despite promoting the important role that Tropical Racing and Troy Levy played with the Company and the significance of their investment in the Company as a vote of

confidence, Troy Levy disclosed on the call that he and Tropical Racing had quietly sold their investment in the Company months earlier.

114.     **Third**, when pressed by members of the community, Troy Levy disclosed that the Board had explored alternative strategic options, but that no amount of capital could save the Company at that point because the business model was not sustainable.  The Investors were never previously informed of this critical information.

### G.     Game of Silks NFTs Are Securities Subject to Regulation Under the Securities Act

115.     Section 2(1) of the Securities Act defines the term security to mean

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1).

116.     An investment contract includes transactions involving an investment of money in a common enterprise with the expectation of profits to come from the efforts of others.

117.     The Securities are investment contracts and are securities subject to regulation under the Securities Act.

### 1.     The Securities Involved a Common Enterprise

118.     The NFTs offered by Game of Silks involved a common enterprise because they required a pooling of the funds from investors, with the fortunes of each investor tied to the overall success of the Game of Silks platform. Each investor's returns were contingent on the growth and

development of the platform, including the performance of their Horse NFTs, the success of the metaverse's economic model, and the continued sale of additional NFTs to sustain the platform.

119.    The sale of the NFTs was used by the Defendants to secure financial investment from the public, including the Plaintiff, for the purpose of developing the Game of Silks metaverse, integrating real-world data into the game, and funding player rewards.  The proceeds from the sale of the NFTs were pooled together to fund the platform's infrastructure, which included the development of the digital horse racing ecosystem, the creation of land-based assets, and the promised reward system that tied in real-world race winnings.

120.    The Selling Defendants informed investors that the proceeds from these NFT sales would be used to develop the full Game of Silks metaverse, including features such as virtual stables, public barns, and in-game marketplaces.  The pooling of investor assets was critical to developing the metaverse and the broader infrastructure, which was necessary for the platform to function.  This created a shared outcome between the investors and the investment pool, as the success of these initiatives would directly impact the value of the NFTs owned by investors.

121.    The success or failure of the Game of Silks platform directly impacted the value of the NFTs held by investors.  If the metaverse and associated features (such as virtual stables and horse racing rewards) were successfully developed, the value of the NFTs would increase. However, failure to develop these aspects would have a negative impact, leading to a decrease in the value of the NFTs, as was evidenced by the project's eventual collapse when the team failed to deliver key promised features.

122.    Moreover, the NFTs also involved a common enterprise because the fortunes of the investors, including the Plaintiff, were closely tied to the fortunes of the Defendants and other promoters of the platform.  The potential returns for investors were directly linked to the success

of the Game of Silks team and its ability to maintain the speculative value of the platform.  The value of the NFTs depended on the Defendants' efforts to develop the metaverse and execute on their promises regarding rewards and asset-backed returns.  Without the Defendants' continued efforts, the appreciation of the NFTs' value could not be realized.

123.    As such, the sale of these NFTs involved a common enterprise, as both horizontal and vertical commonality existed.  The financial success of investors was directly dependent on the efforts of the Game of Silks team and the pooling of resources to develop the platform.

**2.    The Securities Were Sold and Purchased With the Expectation of Profits From the Efforts of Others**

124.    The NFTs were sold and purchased with the clear expectation of profits that would be generated by the continued efforts of the Defendants and others associated with the Game of Silks platform.  The Defendants' promotional, marketing, and solicitation activities explicitly fostered a reasonable belief among investors that these NFTs would appreciate in value over time.  For example, the Defendants promoted the idea that the Horse NFTs were tied to real-world thoroughbred racehorses, and owners would receive a percentage of the winnings from real-life races, thus creating an expectation of passive income and profit.

125.    The marketing efforts highlighted the opportunity to profit from both the racing performance and breeding success of the horses represented by the NFTs, emphasizing that as real-world horses won races and bred offspring, the value of the NFTs would rise.  The Defendants also marketed the Land NFTs as virtual real estate, promising that players could avoid stabling penalties by owning land and even earn additional income by creating public stables where other players could stable their horses for a fee.  These features were touted as long-term investments, generating future returns for the NFT holders.

126.    The generation of profits for NFT holders was fundamentally dependent on the continuous efforts of the managerial team, particularly their ability to develop and expand the Game of Silks metaverse.  This included integrating real-world horse racing data, building out the virtual infrastructure (such as stables and marketplaces), and maintaining the value of the platform through marketing and attracting new players.  Investors were led to believe that their profits would come from these efforts and that the Defendants' success in promoting and developing the platform would directly translate into appreciation of the NFTs' value.

127.    Profits for the NFT holders were clearly designed to be derived from the efforts of the Defendants, who controlled the development, promotion, and future success of the platform. Without their involvement, the promised economic rewards could not be realized, and the value of the NFTs would fail to appreciate.  As such, the expectation of profits in this case was entirely based on the efforts of others.

### 3.    The Sale and Purchase of the Securities Took Place in the United States

128.    The Defendants are all located in the United States and the Plaintiff is located in the United States.

129.    The Securities were sold through the OpenSea platform, which is a decentralized marketplace for NFTs and whose headquarters is located in New York, NY, United States. Secondary sales also took place on OpenSea.

130.    The Plaintiff purchased the Securities through the platform listed above.

131.    The Defendants also marketed the Securities on websites that were based on in the United States, such as Twitter / X or YouTube.

132.    Therefore, the purchase of the Securities by the Plaintiff took place in the United States.

V.    **CLASS ACTION ALLEGATIONS**

133.    Plaintiff brings this class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all purchasers of Game of Silks NFTs who were damaged thereby (the "Class").   Defendants and Defendants' immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any of the foregoing have or had a controlling interest are excluded from the Class.

134.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Members of the Class may be identified by Defendants' own databases, cryptocurrency exchange databases, and blockchain data.  Upon information and belief, these NFTs were held by hundreds of individuals located geographically throughout the country and world.  For example, in an update on the Fourth Quarter 2022 performance provided in January 2023, the team stated that there were more than 25,000 online community members and there were 4,600 wallets that owned 15,000 in-game assets.  Joinder would be highly impracticable.

135.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class purchased Game of Silks NFTs and sustained damages from Defendants' wrongful conduct complained of herein.

136.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel who are competent and experienced in securities or consumer protection class action litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

137.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      Whether the Game of Silks NFTs are securities under the Securities Act;

b)      Whether Defendants' offerings and sales of Game of Silks NFTs violate the registration provisions of the Securities Act;

c)      Whether Defendants omitted and/or misrepresented material facts regarding critical financial information about Game of Silks; and

d)      Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

138.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

139.    Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

140.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action as a class action.

## VI.    CAUSES OF ACTION

### COUNT I

**For Violations of Sections 5 and 12(a)(1) of the Securities Act**
**Against All Defendants**

141.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 140 above as if fully set forth herein.

142.    This Count is asserted against all Defendants, and is based upon Sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e, 77l(a)(1).

143.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.

144.    For purposes of asserting this Count, Plaintiff and the Class do not allege that the defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(1) claim.

145.    The Securities are and were securities as defined by the Securities Act.

146.    Unless a registration statement is in effect with respect to a security, Section 5(a) of the Securities Act makes it unlawful for any person

> (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

15 U.S.C. § 77e(a).

147.    Section 5(c) also makes it unlawful for any person "to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to

sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security." 15 U.S.C. § 77e(a).

148.   A registration statement has never has been in effect, or even filed, to register the Securities with the SEC.

149.   The sales and/or solicitations of the sale of the Securities used the internet as a means or instrument of communication in interstate commerce.  For example, the Defendants promoted and sold the NFTs through the official Game of Silks website, as well as through major NFT marketplaces such as OpenSea.  These platforms were accessible to individuals across state lines and internationally, allowing Defendants to reach a broad audience of potential buyers through internet-based advertisements and promotions.  The Defendants also utilized social media platforms, including Twitter and Discord, to communicate with potential investors and solicit sales of the NFTs.  These digital communications were integral to the sale of the Securities and facilitated the use of interstate commerce to market, promote, and ultimately sell the NFTs to a global audience.

150.   Section 12(a)(1) of the Securities Act provides that any person who sells a security in violation of Section 5 is liable to

> the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 771(a)(1).

151.   A person is liable under Section 12(a)(1) of the Securities Act if that person is a statutory seller, defined as a person who (1) passed titled, or other interest in the security, to the buyer for value, or (2) successfully solicited the purchase of securities, so long as the person is

motivated at least in part by a desire to serve his, her, or its own financial interests or those of the security's owner.

152.    Game of Silks passed title to the Securities to the Plaintiff and the Class, making it a statutory seller with regard to those sales.

153.    Further, all Defendants and/or their agents made numerous public statements touting the Securities, their potential for profit, and encouraging the purchase of the Securities.  As such these defendants solicited the purchase of the Securities for their own financial interest, making them statutory sellers of the Securities. These Defendants received significant financial compensation from the sales of the Securities.

154.    This action is brought within one year after the sale or delivery of the Game of Silks NFTs to members of the Class and within three years of when the Securities were sold to the public.

155.    By reasons of the foregoing, the Defendants are therefore liable for violations of Section 12(a)(1) of the Securities Act to the Plaintiff and the Class for Plaintiff's and the Class's purchases of unregistered Securities.

156.    Plaintiff and the Class hereby tender their Securities back to the Defendants.

## **COUNT II**

**For Violations of Section 12(a)(2) of the Securities Act**
**Against Defendants**

157.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 140 as if fully set forth herein.

158.    This Count is asserted against Defendants, and is based upon 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2).

159.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.

160.    For purposes of asserting this Count, Plaintiff and the Class do not allege that the defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

161.    Section 12(a)(2) of the Securities Act provides that:

Any person who…offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

162.    The Securities are, and were, securities as defined by the Securities Act.

163.    Unless a registration statement is in effect with respect to a security, Section 5(a) of the Securities Act makes it unlawful for any person

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

15 U.S.C. § 77e(a).

164.    A registration statement has never has been in effect, or even filed, to register the Securities with the SEC.

165.     The sales and/or solicitations of the sale of the Securities used the internet as a means or instrument of communication in interstate commerce.  For example, the Defendants promoted and sold the NFTs through the official Game of Silks website, as well as through major NFT marketplaces such as OpenSea.  These platforms were accessible to individuals across state lines and internationally, allowing Defendants to reach a broad audience of potential buyers through internet-based advertisements and promotions.  The Defendants also utilized social media platforms, including Twitter and Discord, to communicate with potential investors and solicit sales of the NFTs.  These digital communications were integral to the sale of the Securities and facilitated the use of interstate commerce to market, promote, and ultimately sell the NFTs to a global audience.

166.     From early 2023 through April 2024, in connection with the offer and sale of the Securities, Defendants made statements on the Internet, including Discord, X (formerly Twitter), and other social media channels that constitute as prospectuses or oral communications within the scope of the Securities Act.

167.     Defendants made numerous untrue statements of material fact or omitted to state material facts necessary to make the statements made not misleading in subject matters related to the Securities.

168.     The statements made contained untrue statements of material fact or omitted to state material facts necessary to make the statements made not misleading.  Not only were these statements untrue or misleading when made, but Defendants did not correct them by the date of the individual purchases by Plaintiff, and thus the statements were untrue or misleading as of the date of the individual purchases.

169.     Specifically, Defendants repeatedly encouraged Plaintiff to invest in the Securities because of the supposed profits they could earn from the performance of the underlying real-world horses, the passive income from developing and renting stables, and other developments of the ecosystem.

170.     These statements were false and misleading because, as alleged herein, Defendants did not disclose that the true economics of the Game of Silks project, including that the project would require more than $20 million in revenue each year to be successful, that key supporters of the project and sold their positions, and that no amount of additional capital would have save the project by the summer of 2024.

171.     A person is liable under Section 12(a)(2) of the Securities Act if that person is a statutory seller, defined as a person who (1) passed titled, or other interest in the security, to the buyer for value, or (2) successfully solicited the purchase of securities, so long as the person is motivated at least in part by a desire to serve his, her, or its own financial interests or those of the security's owner.

172.     Game of Silks passed title to the Securities to the Plaintiff and the Class, making it a statutory seller with regard to those sales.

173.     Further, all Defendants and/or their agents made numerous public statements touting the Securities, their potential for profit, and encouraging the purchase of the Securities.  As such these defendants solicited the purchase of the Securities for their own financial interest, making them statutory sellers of the Securities. These Defendants received significant financial compensation from the sales of the Securities.

174.     This action is brought within one year after the discovery of the untrue statements and omissions contained in the communications and within three years of when the Securities were

sold to the public.  The true financial picture of the Company only became apparent in a discussion

to a small group of investors in the summer of 2024.

175.    By reasons of the foregoing, the Defendants are therefore liable for violations of

Section 12(a)(2) of the Securities Act to the Plaintiff and the Class for Plaintiff's and the Class's

purchases of the Securities pursuant to Defendants' false and misleading prospectuses and

communications.

176.    Plaintiff and the Class hereby tender their Securities back to the Defendants.

## COUNT III

### For Violations of Section 15 of the Securities Act
### Against the Control Person Defendants

177.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 140 as if fully

set forth herein.

178.    This count is asserted against the Control Person Defendants and is based upon

Section 15 of the Securities Act, 15 U.S.C. § 77o.

179.    This Count expressly excludes and disclaims any allegation that could be construed

as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict

liability and/or negligence under the Securities Act.

180.    For purposes of asserting this Count, Plaintiff and the Class do not allege that the

defendants named in this Count acted with scienter or fraudulent intent, which are not elements of

a Section 15 claim.

181.    Section 15 of the Securities Act provides that:

Every person who, by or through stock ownership, agency, or otherwise, or who,
pursuant to or in connection with an agreement or understanding with one or more
other persons by or through stock ownership, agency, or otherwise, controls any
person liable under sections 77k or 77l of this title, shall also be liable jointly and
severally with and to the same extent as such controlled person to any person to
whom such controlled person is liable, unless the controlling person had no

knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

182.    An element of a claim for a violation of Section 15 by controlling persons is a primary violation of Section 12 of the Securities Act (15 U.S.C. § 77l) by a controlled person. As alleged in paragraphs 141 through 176 above, Game of Silks violated Sections 12(a)(1) and 12(a)(2) of the Securities Act.

183.    Dan Nissanoff, as the Chief Executive Officer and Founder of Game of Silks, participated in the operation and management of Game of Silks, and conducted and participated, directly and indirectly, in the conduct of Game of Silks' business affairs, including the issuance of the Securities.

184.    Because of his position of control and authority as the senior officer of Game of Silks, Dan Nissanoff was able to, and did, control the issuance of the unregistered Silks Horse NFTs, Avatar NFTs, and Land NFTs, which were unregistered securities, and the false and misleading statements of Game of Silks.

185.    By virtue of the foregoing, Dan Nissanoff was a "controlling person" of Game of Silks within the meaning of Section 15 of the Securities Act.

186.    Dan Nissanoff also had the power and influence, and exercised the same, to cause Game of Silks to engage in the acts described herein, including by causing Game of Silks to sell and promote the sale of unregistered securities in violation of the Securities Act, and the false and misleading statements of Game of Silks.

187.    By reason of the above conduct, Dan Nissanoff is liable for Game of Silks' wrongful conduct to the same extent Game of Silks is liable under Section 12(a)(1) and 12(a)(2) of the Securities Act to Plaintiff who purchased the Securities.

188.    Troy Levy, as the Vice President and Founder of Game of Silks, and as the CEO of Tropical Racing Inc., participated in the operation and management of Game of Silks, particularly through his role in developing partnerships and leveraging his real-world connections in the horse racing industry to promote the Game of Silks platform and the sale of NFTs.

189.    Because of his position of control and authority, Troy Levy was able to, and did, control the issuance of the unregistered NFTs, which were integral to the promotion and success of the platform.

190.    By virtue of the foregoing, Troy Levy was a "controlling person" of Game of Silks, Inc. within the meaning of Section 15 of the Securities Act.

191.    Troy Levy also had the power and influence, and exercised the same, to cause Game of Silks to engage in the acts described herein, including by causing Game of Silks to sell and promote the sale of unregistered securities in violation of the Securities Act, and the false and misleading statements of Game of Silks.

192.    By reason of the above conduct, Troy Levy is liable for Game of Silks' wrongful conduct to the same extent Game of Silks is liable under Section 12(a)(1) and 12(a)(2) of the Securities Act to Plaintiff who purchased the Securities.

193.    Ron Luniewski, as the Chief Operating Officer of Game of Silks, participated in the operation and management of Game of Silks, particularly through his oversight of daily operations and strategic decision-making related to the platform's development.

194.    Because of his position of control and authority as Chief Operating Officer, Ron Luniewski was able to, and did, control the issuance of unregistered Silks Horse NFTs, Avatar NFTs, and Land NFTs, which were unregistered securities, and the false and misleading statements of Game of Silks.

195.    By virtue of the foregoing, Ron Luniewski was a "controlling person" of Game of Silks within the meaning of Section 15 of the Securities Act.

196.    Ron Luniewski also had the power and influence, and exercised the same, to cause Game of Silks to engage in the acts described herein, including by causing Game of Silks to sell and promote the sale of unregistered securities in violation of the Securities Act, and the false and misleading statements of Game of Silks.

197.    By reason of the above conduct, Ron Luniewski is liable for Game of Silks' wrongful conduct to the same extent Game of Silks is liable under Section 12(a)(1) and 12(a)(2) of the Securities Act to Plaintiff who purchased the Securities.

198.    Derek Cribbs, as the Chief Financial Officer of Game of Silks, participated in the operation and management of Game of Silks, particularly through his financial oversight of the platform's economic model and the handling of funds received from the sale of NFTs.

199.    Because of his position of control and authority as Chief Financial Officer, Derek Cribbs was able to, and did, control the financial management and issuance of unregistered Silks Horse NFTs, Avatar NFTs, and Land NFTs, which were unregistered securities, and the false and misleading statements of Game of Silks.

200.    Derek Cribbs also had the power and influence, and exercised the same, to cause Game of Silks to engage in the acts described herein, including by causing Game of Silks to sell and promote the sale of unregistered securities in violation of the Securities Act, and the false and misleading statements of Game of Silks.

201.    By virtue of the foregoing, Derek Cribbs was a "controlling person" of Game of Silks within the meaning of Section 15 of the Securities Act.

202.     By reason of the above conduct, Derek Cribbs is liable for Game of Silks' wrongful conduct to the same extent Game of Silks is liable under Section 12(a)(1) and 12(a)(2) of the Securities Act to Plaintiff who purchased the Securities.

<u>**COUNT I**</u>V

**In the Alternative, Unjust Enrichment**
**Against All Defendants**

203.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 140 above as if fully set forth herein.

204.     This count is asserted, in the alternative, against all Defendants.

205.     Through the conduct described herein, Defendants received and retained tangible benefits at the expense of the Plaintiff and the Class, including money and assets that Defendants received from their issuance, promotion, sale, and/or solicitation of sale of Game of Silks NFTs to Plaintiff and the Class members.

206.     Under the principles of justice, equity, and good conscience, Defendants should not be permitted to retain the revenue they acquired through their unlawful conduct, i.e., their untrue statements of material fact or omissions of material fact in connection with the offer and sale of Game of Silks NFTs.  All money, assets, and benefits Defendants have unjustly received because of their actions rightfully belong to the Plaintiff and the Class members.

207.     To remedy Defendants' unjust enrichment, the Court should order Defendants to immediately return Plaintiff's investments and disgorge any amounts received by the Defendants as a result of their misconduct alleged herein.

**VII.    <u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiff, individually and behalf of the Class, prays for relief and judgment as follows:

A.      Awarding Plaintiff and the Class damages in an amount that may be proven at trial, together with interest thereon;

B.      Awarding Plaintiff and the Class members rescissory damages of the amount they paid in $ETH or $USD;

C.      Awarding Plaintiff his reasonable attorneys' and experts' witness fees and other costs;

D.      Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest; and

E.      Awarding such other relief as this Court deems appropriate.

## VIII.   <u>JURY DEMAND</u>

Plaintiff request a trial by jury of all claims that can be so tried.

Dated: March 6, 2025          Respectfully submitted,

**WOLF POPPER LLP**

By:  ___/s/ *Joshua W. Ruthizer*_____
Joshua W. Ruthizer
Florida Bar No.: 92528
jruthizer@wolfpopper.com
Chet B. Waldman (*pro hac vice* forthcoming)
cwaldman@wolfpopper.com
Matthew Insley-Pruitt (*pro hac vice* forthcoming)
minsley-pruitt@wolfpopper.com
Terrence Zhang (*pro hac vice* forthcoming)
tzhang@wolfpopper.com

*Attorneys for Plaintiff*

Max Burwick (*pro hac vice* forthcoming)
BURWICK LAW, PLLC
43 West 43rd Street, Suite 114
New York, NY 10036
Email: max@burwick.law

*Attorneys for Plaintiff*