**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 25-80262-CIV-CANNON**

**CARY CANTNER**
*on behalf of himself and others similarly situated,*

Plaintiff,

v.

**GAME OF SILKS, INC., *et al.*,**

Defendants.
______________________________________/

**ORDER GRANTING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION ON AN INDIVIDUAL BASIS AND STAY OR, IN THE ALTERNATIVE, TO TRANSFER, OR TO DISMISS UNDER RULE 12(b)(6)**

**THIS CAUSE** comes before the Court upon Defendants' Motion to Compel Arbitration on an Individual Basis and to Stay Proceedings, or, in the Alternative, to Transfer or Dismiss (the "Motion") [ECF No. 40]. The Court has reviewed the Motion, Plaintiff's Opposition [ECF No. 41], Defendants' Reply [ECF No. 42], the Second Amended Complaint [ECF No. 37], and the full record. The Court also heard argument on the Motion [ECF No. 50]. Being fully advised in the premises, the Motion is **GRANTED IN PART** as set forth below.

## BACKGROUND[1]

On February 24, 2025, a putative class of investors filed a lawsuit against Game of Silks ("GOS"), several of GOS's executive officials, and one of its corporate partners [ECF No. 1]. GOS created and maintained a digital operating system allowing players "to immerse themselves in the roles of horse owners, stables managers, landowners, and syndicate members" through the

[1] The facts in this section are taken from Plaintiff's operative Second Amended Complaint and accepted as true for purposes of this Order.

purchase of Non-Fungible Tokens ("NFTs") [ECF No. 1 p. 1]. Participants in GOS had the ability to "invest in virtual versions of real racehorses and, when the racehorses won at the racetrack, the owners of the virtual horses would win real money" [ECF No. 6 ¶ 1]. Players would purchase cryptocurrency assets that would allow them to own in-game avatars, parcels of land, and stables [ECF No. 6 ¶¶ 40–51]. According to Plaintiff, Defendants informed purchasers of the GOS NFTs that the proceeds from these NFT sales would be used to develop the full GOS metaverse [ECF No. 37 ¶ 59], and that the value of the NFTs would grow as the GOS metaverse continued to develop [ECF No. 37 ¶ 63]. In April 2022, GOS partnered with Tropical Racing, a "prominent thoroughbred horse breeding and racing company" [ECF No. 37 ¶¶ 86–88]. This partnership provided GOS with legitimacy, strategic guidance and financial support [ECF No. 37 ¶ 88].

By July 2024, Defendants stopped making payments on winnings, resulting in a sharp decline in the value of the GOS NFTs and a stoppage of the development of GOS metaverse [ECF No. 6 ¶¶ 103–114]. This led to the GOS NFTs becoming worthless by the end of July 2024 [ECF No. 37 ¶ 119].

Thereafter, "prominent members of the [GOS] community held a meeting with Defendant Troy Levy [Vice President and CO-Founder of GOS] and a member of the Game of Silks board" [ECF No. 37 ¶ 116]. At this meeting, Plaintiff and other class members learned "important pieces of information for the first time" [ECF No. 37 ¶¶ 116–118]—including that "the [GOS] project would require more than $20 million in revenue each year to be successful" [ECF No. 37 ¶¶ 116, 175]; that key partners Troy Levy and Tropical Racing had "quietly sold their investment months earlier" [ECF No. 37 ¶ 117]; and that GOS' board had "explored alternative strategic options, but that no amount of capital could save the Company at that point" [ECF 37 ¶ 118].

On the basis of these allegations, Plaintiff asserts the following five causes of action in the Second Amended Complaint, each on behalf of a putative class of "all purchasers of Game of Silks NFTs": (1) Violation of Sections 5 and 12(a)(1) of the Securities Act (asserted against all Defendants); (2) Violation of Section 12(a)(2) of the Securities Act (asserted against all Defendants); (3) Violations of Section 15 of the Securities Act (asserted against the "Control Person Defendants"); (4) Violation of the Florida Deceptive and Unfair Trade Practices Act (asserted against all Defendants); and (5) Unjust Enrichment (asserted against all Defendants) [ECF No. 37].[2]

Central to this dispute is the existence of a contract involving specific Terms and Conditions ("Terms"). Defendants allege that anyone who used their platform was required to assent to these Terms, which notably include a mandatory arbitration clause and a Delaware choice of law provision [ECF No. 40-6]. The signatories to these alleged Terms are Defendant GOS and the Plaintiff [ECF No. 40-6]. The remaining Defendants named in the Second Amended Complaint are nonsignatories to the Terms: Dan Nissanoff (Chief Executive Officer of GOS), Ron Luniewski (Chief Operating Officer of GOS), Derek Cribbs (Chief Financial Officer of GOS), Tropical Racing Inc. (GOS' lead strategic investor and partner), and Troy Levy (Vice President and Co-Founder of GOS and Chief Executive Officer of Tropical Racing) [ECF No. 37].

On July 25, 2025, Defendants filed the instant Motion to Compel Arbitration, Transfer Venue, or, in the alternative, Dismiss under 12(b)(6) [ECF No. 40-1]. Defendants claim that the case should be stayed against all parties and that arbitration should be compelled based on the Terms. In the alternative, if arbitration is not compelled, Defendants ask the Court to transfer this

[2] The Court dismissed Plaintiff's initial complaint as a shotgun pleading, after which Plaintiff filed an amended complaint [ECF Nos. 5–6]—and then, shortly after becoming the lead plaintiff [ECF No. 36], Plaintiff filed the operative Second Amended Complaint [ECF No. 37].

case to the District of Delaware pursuant to a forum selection clause contained in the agreement [ECF No. 40-1 p. 24]. Finally, Defendants claim that Plaintiff's underlying claims warrant dismissal for failure to state a claim under Rule 12(b)(6) [ECF No. 40-1 p. 24].

**LEGAL STANDARDS**

The Court "treat[s] motions to compel arbitration similarly to motions for summary judgment," viewing the facts in the light most favorable to the nonmovant. *Hearn v. Comcast Cable Commc'ns, LLC*, 992 F.3d 1209, 1215 n.3 (11th Cir. 2021); *see Bazemore v. Jefferson Cap. Sys*., LLC, 827 F.3d 1325, 1333 (11th Cir. 2016) ("We agree with our sister circuits that a summary judgment-like standard is appropriate and hold that a district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement.").

The Federal Arbitration Act ("FAA") governs the validity of an arbitration agreement. *Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326, 1329 (11th Cir. 2014) (citation omitted). The FAA provides that a written agreement to arbitrate a controversy "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. When one party has failed, neglected, or refused to comply with an arbitration agreement, the FAA requires the federal court to compel arbitration upon proper motion. *See id.* § 4; *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (observing that the FAA "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed"). The FAA creates a "presumption of arbitrability" such that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1115–16 (11th Cir. 2014); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 24

(1983) (observing that the FAA embodies a "liberal federal policy favoring arbitration agreements").

Although the FAA governs the validity of an arbitration agreement, "state law governs the interpretation and formation of such agreements," including whether parties meet the assent element of contract formation. *See 1 Emps. Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2001) (citing *Perry v. Thomas*, 482 U.S. 483 (1987)).[3] In the context of the internet, Florida law recognizes two common ways in which arbitration agreements may be presented to computer users: "browsewrap" and, as relevant here, "clickwrap agreements." *MetroPCS Commc'ns, Inc. v. Porter*, 273 So. 3d 1025, 1028 (Fla. Dist. Ct. App. 2018). "A clickwrap contract refers to an agreement that requires a computer user to read the agreement and click 'I accept' before proceeding to the next screen or obtaining additional information." *Salco Distributors, LLC v. iCode, Inc.*, No. 05 CV 642, 2006 WL 449156, at *2 n.5 (M.D. Fla. Feb. 22, 2006).

In *Lamonaco*, the Eleventh Circuit clarified the evidentiary burden for establishing a clickwrap agreement: "[t]he party asserting the [clickwrap] agreement must prove its existence by a preponderance of the evidence." 141 F.4th 1343, 1347 (11th Cir. 2025). "A declaration that sets forth specific facts based on personal knowledge, describes the enrollment process, and appends the operative contract is competent evidence sufficient to satisfy [the movant's] initial burden." *Id.* at 1348. Once the Defendant has carried this initial burden, the burden shifts to the Plaintiff to offer a factual rebuttal. *Id.* ("[A]nd where, as here, the opposing party offers no factual rebuttal, the FAA and Florida contract law require no more to compel arbitration.").

---

[3] The law of contract formation in the forum state (Florida) applies to first determine the existence of a contract. *First Options of Chicago Inc. v. Kaplan*, 514 U.S 938, 943 (1995).

Arbitration agreements may delegate threshold questions of arbitrability—including what disputes are subject to arbitration and to whom the arbitration provision applies—to the arbitrator. *Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1299–1300 (11th Cir. 2022). Delegation is found if the parties clearly and unmistakably agreed that an arbitrator would decide all threshold questions about the arbitrability of Plaintiff's claims. *Id.* at 1289. One way the parties can clearly and unmistakably agree to such delegation is through the incorporation of arbitration rules (e.g., the rules of the American Arbitration Association) that assign the resolution of such questions to an arbitrator. *Id.* at 1297–98. If questions of arbitrability are delegated, the Court must refer all questions of arbitrability between signatories to the arbitration agreement to the arbitrator. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 71 (2019). However, courts are to decide for themselves whether claims against nonsignatories should be sent to arbitration. *Taylor Grp., Inc. v. Indus. Fistributors Int'l Co.*, 506 F. Supp. 3d 1256, 1266 (S.D. Fla. Dec. 10, 2020).

Generally, only signatories to arbitration are bound by the agreement. *Lawson v. Life of the South Ins. Co.*, 648 F.3d 1166, 1167 (11th Cir. 2011) ("A rule of contract law is that one who is not a party to an agreement cannot enforce its terms against one who is a party."); *Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 760 (Del. Ch. 2009) ("Only the formal parties to a contract are bound by its terms."). However, a nonsignatory to an arbitration agreement may compel a signatory to that agreement to arbitrate based on, *inter alia*, equitable estoppel if the relevant state law so permits. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009) (noting that the FAA does not displace state law "permitting arbitration by or against nonparties to the written arbitration agreement"). Equitable estoppel has been used for this purpose

under both Delaware law and Florida law.[4] *See Allscripts Healthcare Sols., Inc. v. Pain Clinic of Nw. Fla.*, 158 So. 3d 644, 646 (Fla. Dist. Ct. App. 2014) (recognizing that, under the doctrine of equitable estoppel, Florida courts have previously permitted nonsignatory defendants to enforce an arbitration clause against a signatory plaintiff); *see also Wilcox & Fetzer, Ltd. v. Corbett & Wilcox*, No. CIV.A. 2037-N, 2006 WL 2473665, at *4 (Del. Ch. Aug. 22, 2006) ("Like many jurisdictions, Delaware allows a nonsignatory to a contract to compel a signatory to arbitrate under an equitable estoppel theory.").

Under both Florida and Delaware law, the doctrine of equitable estoppel may be triggered in two independent ways: either where the signatory's claims rely on or are intertwined with the underlying agreement ("intertwined with agreement prong"), or where, as here, the signatory alleges substantially interdependent and concerted misconduct by both signatories and nonsignatories ("concerted misconduct prong"). *See Wilcox*, 2006 WL 2473665, at *4–5 (explaining that a nonsignatory may rely on equitable estoppel to compel a signatory to arbitrate in the above two circumstances); *Allscripts*, 158 So. 3d at 646 (same); *see also Dimattina Holdings, LLC v. Steri-Clean, Inc.*, 195 F. Supp. 3d 1285, 1292 (S.D. Fla. Jul. 18, 2016) (explaining that substantially interdependent and concerted misconduct is alleged when claims against signatory Defendants and nonsignatory Defendants are "one and the same" or "mirror each other"). Courts have found the following circumstances to weigh in favor of a finding that the concerted misconduct exception applies: (1) the counts asserted against signatory defendants are based on the same underlying facts as the corresponding counts asserted against nonsignatory

[4] While the Terms contain a Delaware choice-of-law provision [ECF No. 40-6 § 16], the parties briefed Florida law in their filings on this matter [ECF Nos. 40-1, 41, 42]. Accordingly, out of an abundance of caution, the Court analyzes all non-contract formation issues under both sets of laws and finds that the outcome is the same.

defendants; (2) the complaint repeatedly refers to the actions of signatory and nonsignatory defendants collectively; and (3) the signatory defendant is a corporation and the plaintiff alleges that the nonsignatory defendants carried out the challenged misconduct through that corporate entity. *See id.*[5]

## I. PLAINTIFF'S CLAIMS AGAINST SIGNATORY DEFENDANT GOS

### A. Assent to Arbitration

The first question to address is whether Defendants have carried their burden to show that Plaintiff assented to the Terms under the standard set forth in *Lamonaco*. Plaintiff argues that Defendants cannot carry their burden to prove such an agreement exists because Defendants failed to produce the specific version of the contract to which Plaintiff agreed [ECF No. 41 pp. 6–8]. Defendants disagree, pointing to an array of evidence they submitted to establish assent, including declarations regarding the sign-up process and system requirements, all of which they say is

[5] *See also Shamsi v. Levin*, No. 17-cv-80372, 2017 WL 7803807, at *5 (S.D. Fla. Oct. 27, 2017) (finding concerted misconduct equitable estoppel where each count alleged "substantially interdependent and concerted misconduct" by the signatory and nonsignatory, the nonsignatory entities were merely the "corporate vehicle through which [the signatory] engaged in the alleged misconduct," and every claim against the nonsignatory was asserted jointly with the signatory and "based on the same facts"); *Douzinas v. American Bureau of Shipping, Inc.*, 888 A. 2d 1146, 1153 (Del. Ch. 2006) ("One circumstance that frequently warrants such [equitable] estoppel is when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract."); *Armas v. Prudential Sec., Inc.*, 842 So. 2d 210, 212 (Fla. Dist. Ct. App. 2003) ("Equitable estoppel is warranted when the signatory to the contract containing the arbitration clause raises allegations of concerted conduct by both the nonsignatory and one or more of the signatories to the contract."); *Santiago v. Neno Rsch. LLC*, No. 24-13733, 2025 WL 1793306, at *1 (11th Cir. June 30, 2025) (stating that under Florida law, "[e]quitable estoppel also applies when the signatory to the contract containing [the] arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract."); *AMJ Cap. OZ Fund I, LLC v. MZF Tr.*, No. 25-cv-1397, 2025 WL 2617898, at *10–11 (D.N.J. Sept. 10, 2025) (applying Delaware law and finding the same).

enough under *Lamonaco* to establish Plaintiff's assent to the Terms [ECF No. 40-1 p. 8; ECF No. 42 p. 3].

Upon review of the parties' competing arguments, the Court determines that Defendants have met their initial burden to prove the existence of an agreement by a preponderance of the evidence. Defendants submitted sworn declarations from individuals with personal knowledge of the GOS sign-up interface and rewards distribution process [ECF Nos. 40-2, 40-3, 40-4]. These declarations, provided by those who created and oversaw the systems, attest that (a) users were not able to access the GOS platform until they assented to the Terms [ECF Nos. 40-3, 40-4]; and (b) the GOS system would not allow rewards to be paid out unless a user had assented to the Terms [ECF Nos. 40-2, 40-4]. Additionally, Defendants provided corroborating documentary evidence in the form of screenshots of the sign-up process clearly exhibiting that the "Create my account" button—which must be clicked to register and receive rewards—remains inactive and cannot be clicked until a user checks a box assenting to the Terms [ECF No. 40-5]. Defendants also attached the Terms, which indicates they were "last updated on April 27, 2022," the very day on which Plaintiff first transacted on the GOS Platform [ECF Nos. 40-6, 31-3]. And at the hearing, Defendants presented excerpts from Plaintiff's Motion for Appointment as Lead Plaintiff [ECF No. 31-3], showing he received rewards from the platform.

Plaintiff says this evidence is insufficient to establish assent by a preponderance of the evidence because the specific contract Plaintiff signed was not produced in the record on the Motion (Tr. pp. 33:7–25, 34:1–21). *Lamonaco*, 141 F.4th at 1347 ("The party asserting the agreement must prove its existence by a preponderance of the evidence."). This argument does not offer a factual rebuttal to the evidence put forth by Defendants' evidence. To begin, it is uncontested that Plaintiff held an account on GOS and transacted on the GOS platform (including

by receiving rewards) from April 27, 2022, through April 14, 2024 [ECF No. 31-3 pp. 2, 4–18 (transaction history); *see* ECF No. 31 p. 8; (Tr. p. 32:19–25); *see generally* ECF No. 37 ¶¶ 48, 119 (referencing commencement of public offering of Silks Avatars NFTs on April 27, 2022, and continuing through July 2024 when Defendants suspended the platform)].[6] Nor is it disputed that users could not access platform features and rewards without agreeing to the Terms [ECF No. 40-2 ¶ 3; ECF No. 40-3 ¶ 3; ECF No. 40-4 ¶¶ 4–5, 8–14]. Furthermore, Plaintiff's own filings confirm that he purchased and earned on the GOS platform for the first time on April 27, 2022 [ECF No. 31-3 p. 4], which matches the date contained in the Terms produced by Defendants [ECF No. 40-6]. This is strong evidence that the Terms cover the relevant temporal period. More broadly, given the sworn declarations from multiple individuals with personal knowledge, the attached Terms, and the screenshots of the sign-up page demonstrating that an account could not exist (and that rewards could not be received without assenting to the Terms), Defendants have established by a preponderance of the evidence that Plaintiff assented to the Terms. To conclude otherwise would be to elevate form over substance and to overlook all of the compelling circumstantial evidence supporting the uniform and reliable conclusion that Plaintiff agreed to the Terms when he registered to use the platform and received benefits through the platform.

**B. Delegation of Arbitrability**

Having established that Plaintiff assented to the relevant arbitration provision as contained within the Terms, the Court next turns to the arbitration provision itself to determine whether the parties clearly agreed to delegate questions of arbitrability to an arbitrator. The answer here is yes. The operative delegation provision in the Terms states that "all disputes" shall be "referred to and

---

[6] The transcript of the hearing is not on the docket but is cited to in this Order using the following convention: "Tr. p. __."

finally resolved by arbitration administered by JAMS [Judicial Arbitration and Mediation Services] under its Streamlined Arbitration Rules and Procedures and the JAMS Consumer Arbitration Minimum Standards" [ECF No. 40-6 § 15]. This provision clearly incorporates JAMS Rules, which themselves delegate threshold questions of arbitrability to the arbitrator. Specifically, JAMS Rule 8(b) provides that "[j]urisdictional and arbitrability disputes, including any disputes over the formation, existence, validity, and interpretation or scope of the agreement under which Arbitration is sought, and who are proper parties to the arbitration, shall be submitted to and ruled on by the Arbitrator" [ECF No. 42 p. 6]—thereby delegating these determinations away from the Court. Accordingly, the claims (Counts 1, 2, 4, and 5) brought by Plaintiff against GOS must be compelled to arbitration pursuant to JAMS Rule 8(b) for a determination of arbitrability.

## II. PLAINTIFF'S CLAIM AGAINST NONSIGNATORY DEFENDANTS

Plaintiff argues that even if arbitration is warranted as to signatory GOS in accordance with the delegation clause, no such result obtains as to Defendants Dan Nissanoff, Troy Levy, Tropical Racing, Inc., Ron Luniewski, and Derek Cribbs—who did not sign the Terms and therefore did not, as the argument goes, agree to be bound by any arbitration clause [ECF No. 41 pp. 12–13]. The nonsignatory Defendants acknowledge their lack of express consent to the contract (Tr. pp. 17:18–25, 18:1–7) but invoke the doctrine of equitable estoppel as a means to enforce arbitration against them under Florida or Delaware law [ECF No 42 pp. 6–7].

Under either Florida or Delaware law, equitable estoppel applies here—specifically the "substantially interdependent and concerted misconduct" form of the doctrine—to bind the nonsignatory Defendants to the arbitration clause in the Terms.[7] Throughout the Second Amended

[7] While the Terms contain a Delaware choice-of-law provision [ECF No. 40-6 § 16], the parties briefed Florida law in their filings on this matter [ECF Nos. 40-1, 41, 42]. Accordingly, out of an

Complaint, Plaintiff routinely pleads alleged misstatements and omissions by referring to "Defendants" as a single group, without differentiating between GOS and the nonsignatory Defendants. This combined attack applies with respect to Defendants' alleged omissions, promises of growth, and statements regarding the alleged collapse of the NFT platform.[8] Courts confronted with this form of collective pleading—where defendants' conduct "mirror[s] each other" and arises from the same alleged course of conduct—have found concerted misconduct sufficient to invoke the Terms against non-signatories through the doctrine of equitable estoppel. *See Dimattina Holdings, LLC*, 195 F. Supp. 3d at 1292. And Plaintiff reinforced this interrelatedness during the hearing, agreeing with the fundamental point that (according to Plaintiff's allegations) Defendants worked together to deceive users regarding the investment potential of the NFTs, and consistently referring to Defendants collectively (Tr. pp. 51–54).[9]

---

abundance of caution, the Court analyzes all non-contract formation issues under both sets of laws and finds that the outcome is the same.

[8] For example, with respect to alleged omissions, Plaintiff alleges that (a) "Defendants omitted key information in the public offerings of these unregistered securities, which need to be contained in a prospectus that was not filed, when they promoted and sold these NFTs" [ECF No. 37 ¶ 12], and (b) "Defendants did not disclose the true economics of the Game of Silks project . . . ." [ECF No. 37 ¶ 175]. Similarly, with respect to alleged promises of growth, Plaintiff alleges that "Defendants detailed the time frame when they expected the payments to approach real-world levels" [ECF No. 37 ¶ 68]; "repeatedly encouraged Plaintiff and other members of the public to invest in the Securities because of the supposed profits they could earn from the performance of the underlying real-world horses, the passive income from developing and renting stables, and other developments of the ecosystem" [ECF No. 37 ¶ 174]; and "promised that the game would have longevity" [ECF No. 37 ¶ 75]. Finally, regarding the project's alleged collapse, Plaintiff alleges collectively that "Defendants failed to sell the Season 2 Silks Horses NFTs" [ECF No. 37 ¶ 111], "stopped making payments on the winnings" [ECF No. 37 ¶ 112], and "suspended the platform causing the NFTs to become worthless" [ECF No. 37 ¶ 119]. *See also* [ECF No. 37 ¶¶ 3, 11 (referring to "Defendants" collectively selling NFTs, allowing investors to benefit from the Company, and conveying increased returns and profits)].

[9] To the extent some distinctions could be drawn in the Second Amended Complaint, at a count-by-count level, between certain discrete acts taken by non-signatory individual defendants (Tr. p. 54), those distinctions do not change the reality that the Second Amended Complaint clearly alleges that the non-signatory defendants were acting for, and on behalf of GOS, and otherwise

Finally, insofar as Plaintiff argues that application of equitable estoppel under Florida or Delaware law requires the alleged misconduct to be "founded in" or "intimately connected" with the obligation of the underlying agreement, relying on *Lavigne v. Herbalife*, 967 F.3d 1110 (11th Cir. 2020), this argument fails [*see* ECF No. 41 p. 19; Tr. pp. 45–46]. To begin, *Lavigne* applies California law in analyzing equitable estoppel. *Lavigne*, 967 F.3d at 1115. Neither Florida nor Delaware law appears to restrict the doctrine of equitable estoppel in such a way. *See, e.g.*, *Dimattina Holdings, LLC,* 195 F. Supp. 3d at 1292 n.5.[10] In any event, even if such a connection were required to establish equitable estoppel, Plaintiff's claims are sufficiently connected with the interpretation of the contractual obligations created by the Terms, including provisions that limit liability for GOS's "parents, subsidiaries, and affiliates" [ECF No. 40-6 §§ 7, 8]. Plaintiff expressly seeks consequential damages, rescissory damages, disgorgement, and other monetary relief [ECF No. 37]. Yet Sections 7 and 8 of the Terms contain sweeping warranty disclaimers and a limitation-of-liability clause that bars recovery of "any consequential, incidental, indirect, special or exemplary damages" arising from the platform or NFTs [ECF No. 40-6 §§ 7–8]. Determining what relief, if any, is available necessarily requires interpretation of these provisions to assess the rights and limitations imposed by them. *See Wilcox*, 2006 WL 2473665 at *4 (claims fall within

---

acting in an interrelated fashion in connection with the allegedly wrongful conduct [*see, e.g.*, ECF No. 37 ¶ 3 (alleging that "Defendants sold these various NFTs to the public" and "made it clear that the funds from their sale would drive the Company's development"); ECF No. 37 ¶ 4 (alleging that "Defendants made it clear that the public investors would see increased returns and profits"); ECF No. 37 ¶ 12 (alleging that "Defendants omitted key information in the public offerings of these unregistered securities"); ECF No. 37 ¶ 111 ("Defendants failed to sell [sufficient NFTs to allow the project to continue]"); ECF No. 37 ¶¶ 112, 119, 174–175].

[10] *Armas v. Prudential Sec., Inc.*, 842 So. 2d 210, 212 (Fla. Dist. Ct. App. 2003); *GNH Grp., Inc. v. Guggenheim Holdings, L.L.C.*, No. CV 19-1932-CFC, 2020 WL 4287358, at *6–7 (D. Del. July 27, 2020), *report and recommendation adopted*, No. CV 19-1932-CFC, 2020 WL 13679908 (D. Del. Aug. 19, 2020); *Douzinas v. American Bureau of Shipping, Inc.*, 888 A.2d 1146, 1153 (Del. Ch. 2006).

broad clause when adjudication would "inevitably require the Court to determine the rights of [the parties] pursuant to the Agreement"); *see also Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 638 (Fla. 1999).

Accordingly, the doctrine of equitable estoppel applies to bind the nonsignatory Defendants to the arbitration clause in the Terms.

This leaves only one step remaining in the analysis: to determine whether the claim against the nonsignatory Defendants (Count 3) falls within the scope of the arbitration provision. *See Kroma Makeup EU, LLC*, 845 F.3d at 1355 (finding that, even where a nonsignatory can rely on equitable estoppel "to access [the arbitration] clause," the nonsignatory can compel arbitration only if the dispute at issue "falls within the scope of the arbitration clause"). In this case, as noted, that duty has been delegated to the arbitrator in the applicable Terms—not to the Court [ECF No. 40-6 § 15(i)]—and hence the Court cannot go further and consider the scope of arbitration. *See Henry Schein, Inc.*, 586 U.S. at 65 ("When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract."); *Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1296 (11th Cir. 2022) ("[I]f the court finds that the parties have clearly and unmistakably agreed to delegate questions of arbitrability to an arbitrator, it 'must respect the parties' decision as embodied in the contract.'") (quoting *Henry Schein, Inc.*, 586 U.S. at 65)); *Emergency Recovery Inc. v. Conifer Revenue Cycle Sols., LLC*, No. 24-CV-22426, 2025 WL 71974, at *7 (S.D. Fla. Jan. 10, 2025) ("However, the scope of arbitration is not a question for the undersigned to decide because the Court finds the Contract's provision delegating issues of arbitrability to the arbitrator is valid and enforceable."). Count 3 must be compelled to arbitration pursuant to JAMS Rules for a determination of arbitrability.

## CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion to Compel Arbitration [ECF No. 40] is **GRANTED IN PART** in accordance with this Order.[11] [12]
2. This case is **STAYED** without prejudice pending resolution of the arbitration.
3. Every **180 days** following the date of this Order, the parties are directed to **jointly file** a status report apprising the Court of the status of the dispute resolution process.
4. The Clerk of Court shall **CLOSE** this case for administrative purposes only.
5. Any scheduled hearings are **CANCELED**, any pending motions are **DENIED AS MOOT**, and all deadlines are **TERMINATED**.

**ORDERED** in Chambers at Fort Pierce, Florida, this 3rd day of March 2026.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

[11] To the extent that questions remain regarding whether the claims against the nonsignatory defendants fall within the scope of the arbitration provision, or whether arbitration must be compelled on an individual or collective basis, such issues must be decided by a JAMS-affiliated arbitrator pursuant to the delegation clause and JAMS rules. *See Attix*, 35 F.4th at 1309.

[12] In light of this Order, the Court expresses no opinion on any other aspect of Defendants' Motion.